UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| GLYNN HOSPITALITY GROUP, INC., | ) ) ) ) ) | |
| Plaintiff | ) ) ) | |
| v. | ) ) ) | Case No. 21-cv-10744-DJC |
| RSUI INDEMNITY COMPANY, | ) ) ) | |
| Defendant. | ) ) ) ) | |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                                       **November 12, 2021**

**I.      Introduction**

Plaintiff Glynn Hospitality Group ("Glynn") has filed this lawsuit against Defendant RSUI Indemnity Company ("RSUI") alleging claims for breach of contract (Count I), breach of the covenant of good faith and fair dealing (Count II) and violations of Mass. Gen. L. c. 93A (Count III) arising from RSUI's denial of coverage under Glynn's insurance policy (the "Policy") for business income loss and other expenses incurred due to the COVID-19 pandemic.  D. 1-1.  RSUI now moves to dismiss for failure to state a claim, arguing that Glynn's losses are not covered under the Policy.  D. 15.  For the reasons stated below, the Court ALLOWS the motion.

**II.     Standard of Review**

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), the Court must determine if the facts alleged "plausibly narrate a claim for relief."  Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (citation omitted).  Reading the complaint "as a whole," the Court must conduct a two-step, context-specific

1

inquiry.  García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013).  First, the Court must perform a close reading of the claim to distinguish the factual allegations from the conclusory legal allegations contained therein.  Id.  Factual allegations must be accepted as true, while conclusory legal conclusions are not entitled credit.  Id.  Second, the Court must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the conduct alleged."  Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (citation omitted).  In sum, the complaint must provide sufficient factual allegations for the Court to find the claim "plausible on its face."  García-Catalán, 734 F.3d at 103 (citation omitted).

### III.     Factual Background

The following factual allegations in Glynn's complaint, D. 1-1, are accepted as true for consideration of the motion to dismiss.

        1.     *The Policy*

Glynn operates several restaurants, bars, pubs and entertainment venues located in Boston, Massachusetts.  D. 1-1 ¶ 43.  Glynn purchased the Policy from RSUI for the term beginning September 29, 2019 and ending September 29, 2020.  Id. ¶ 3.  The Policy covers business income and extra expense loss coverage and coverage for closure by order of civil authority at each of Glynn's insured properties.  Id. ¶ 6 (listing insured properties); id. ¶ 107.  These provisions provide in relevant part:

> [RSUI] will pay for the actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration'.  The 'suspension' must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit Of Insurance is shown in the Declarations.  The loss or damage must be caused by or result from a Covered Cause of Loss.

Id. at 72; id. at 91 (defining "Covered Causes of Loss" as "direct physical loss unless the loss is excluded or limited" under the Policy); see id. ¶ 102.

2

> Extra Expense means necessary expenses you incur during the 'period of restoration' that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

Id. at 72; see id. ¶ 105.

> 'Period of restoration' means the period of time that: (a) Begins: (1) 72 hours after the time of direct physical loss or damage for Business Income Coverage; or (2) Immediately after the time of direct physical loss or damage for Extra Expense Coverage; Caused by or resulting from any Covered Cause of Loss at the described premises; and (b) Ends on the earlier of: (1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or (2) The date when business is resumed at a new permanent location.

Id. at 80.

> When a Covered Cause of Loss causes damage to property other than property at the described premises, [RSUI] will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply: (1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and (2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Id. at 73; see id. ¶ 107.

The Policy contains a coverage exclusion for loss caused by pathogenic material ("Pathogen Exclusion"). Id. at 50. The exclusion states in relevant part:

> [RSUI] will not pay for loss or damage caused directly or indirectly by the discharge, dispersal, seepage, migration, release, escape or application of any pathogenic or poisonous biological or chemical materials. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

Id.

### 2.  The COVID-19 Pandemic

The coronavirus responsible for the COVID-19 pandemic, SARS-CoV-2 (the "COVID-19 virus") is transmitted through respiratory droplets, fomites or aerosols which can remain suspended in the air for prolonged periods of time.  Id. ¶ 11.  Being airborne, the COVID-19 virus can be spread through buildings and their airways, lingering on different types of surfaces for varying lengths of time ranging from a few hours to a few days.  Id. ¶¶ 15–16.  Individuals carrying the COVID-19 virus can infect others even though these carriers are asymptomatic, transmitting the virus either directly or indirectly.  Id. ¶ 22.  Because the virus travels in aerosols or can remain active on surfaces, viral aerosols can end up on surfaces or in the air of buildings when carriers inside such buildings speak, shout or sing.  Id.  As alleged in the complaint, "[t]he COVID-19 virus was ubiquitous in all parts of the [g]reater Boston Area."  Id. ¶ 12.

Beginning in March 2020, state and local officials in Massachusetts issued a series of emergency orders intended to limit the spread of the COVID-19 virus and mitigate the pandemic.  Id. ¶ 24.  On March 13, 2020, Massachusetts Governor Charles Baker ("Governor Baker") issued an order prohibiting gatherings of more than two hundred fifty people.  Id. ¶ 25.[1]  On March 15, 2020, Governor Baker further prohibited gatherings of more than twenty-five people and ordered restaurants to cease on-premises consumption of food or drink.  Id. ¶ 26; see D. 16-3.  That same day, Martin Walsh, Mayor of Boston ("Mayor Walsh"), issued executive orders similarly restricting on-premises restaurant and bar services.  D. 1-1 ¶ 27.

---

[1] See Office of Governor Charlie Baker and Lt. Governor Karyn Polito, Order Prohibiting Gatherings of More Than 250 People (Mar. 13, 2020), https://www.mass.gov/doc/order-prohibiting-gatherings-of-more-than-250-people/download (last visited Nov. 12, 2021).  Since the Court may consider facts susceptible to judicial notice, see Schatz, 669 F.3d at 55–56, the Court has considered this order and other emergency orders issued by Governor Baker.  See D. 16-3; D. 16-4; see also infra footnote 2.

On March 23, 2020, Governor Baker issued an order mandating the closure of certain businesses in the Commonwealth, effective March 24, 2020. Id. ¶ 28; see D. 16-4. Under the order, all businesses "not provid[ing] COVID-19 Essential Services" were required to "close their physical workplaces and facilities ('brick-and-mortar premises') to workers, customers, and the public" from noon on March 24, 2020 to noon on April 7, 2020. D. 1-1 ¶ 28; see D. 16-4. Restaurants, bars and other similar establishments could continue to offer food for take-out and by delivery but not for on-premises consumption.[2] The order further limited gatherings to no more than ten people. D. 1-1 ¶ 28; see D. 16-4.

### 3. The Pandemic's Effect on Glynn's Businesses

As alleged, the COVID-19 virus was present at each of Glynn's locations at all relevant times, or there was an imminent risk of on-site viral presence at all relative times, or both. D. 1-1 ¶ 36. Due to the government orders or the actual presence of the COVID-19 virus, Glynn experienced significant disruption at its businesses. Id. ¶ 44. Some of its locations shut down completely from March 15, 2020 to June or July 2020, after which they reopened on a limited basis relying more heavily on takeout orders. Id. ¶¶ 45–52. Other locations closed on March 15, 2020 and remained closed as of the filing of the complaint in February 2021. Id. ¶ 53. Glynn suffered substantial losses of food and perishable inventories by closing its restaurant operations. Id. ¶ 61. Moreover, Glynn was unable to provide on-site food, drink or private event sales, further impeding its business. Id. ¶ 65. Prior to the partial reopening at certain locations, Glynn, among

---

[2] See Office of Governor Charlie Baker and Lt. Governor Karyn Polito, Exhibit A of the Order of the Governor Assuring Continued Operation of Essential Services in the Commonwealth, Closing Certain Workplaces and Prohibiting Gatherings of More Than 10 People (Mar. 23, 2020), https://www.mass.gov/doc/covid-19-essential-services/download (last visited Nov. 12, 2021) (stating that "[r]estaurants, bars, and other establishments that sell food and beverage products to the public are encouraged to continue to offer food for take-out and by delivery if they follow" social distancing protocols, while "[o]n-premises consumption of food or drink is prohibited").

other actions, increased its cleaning and decontamination efforts, created outdoor eating spaces, added plexiglass barriers and reconfigured the interiors of its businesses.  Id. ¶ 66.

Seeking to recoup revenues lost due to the pandemic, on July 27, 2020, Glynn submitted a notice to RSUI claiming that it had incurred business income losses during the policy term.  Id. ¶ 83.  Following a telephone call between the parties, RSUI issued a denial letter on August 24, 2020.  Id. ¶ 84; see id. at 104–08 (attaching letter as exhibit to complaint).  In denying coverage, RSUI explained that the suspension in Glynn's operations "must be caused by direct physical loss or damage" at the insured properties and that the Policy "does not cover loss or damage caused directly or indirectly by the discharge, dispersal, seepage, migration, release, escape or application of any pathogen[]."  Id. at 108 (emphasis omitted).

### IV.   Procedural History

Glynn commenced this action in Suffolk Superior Court on February 4, 2021.  D. 1-1.  RSUI then removed the case to this Court.  D. 1.  RSUI now moves to dismiss.  D. 15.  The Court heard the parties on the pending motion and took the matter under advisement.  D. 37.

### V.   Discussion

#### A.   Breach of Contract (Count I)

The interpretation of an insurance policy is a question of law for the court.  See Ruggerio Ambulance Serv. v. Nat'l Grange Mut. Ins. Co., 430 Mass. 794, 797 (2000).  Under Massachusetts law, the court "construe[s] an insurance policy under the general rules of contract interpretation, beginning with the actual language of the polic[y], given its plain and ordinary meaning."  Easthampton Congregational Church v. Church Mut. Ins. Co., 916 F.3d 86, 91 (1st Cir. 2019) (quoting AIG Prop. Cas. Co. v. Cosby, 892 F.3d 25, 27 (1st Cir. 2018)).  While "ambiguous words or provisions are to be resolved against the insurer," City Fuel Corp. v. Nat'l Fire Ins. Co. of

Hartford, 446 Mass. 638, 640 (2006), "provisions [that] are plainly and definitely expressed in appropriate language must be enforced in accordance with [the policy's] terms," High Voltage Eng'g Corp. v. Fed. Ins. Co., 981 F.2d 596, 600 (1st Cir. 1992) (quoting Stankus v. N.Y. Life Ins. Co., 312 Mass. 366, 369 (1942)).

       *1.*    *Business Income or Extra Expense Coverage*

RSUI argues that it properly denied coverage for loss of business income and extra expenses arising from the COVID-19 pandemic because the Policy requires any such loss to have been caused by "direct physical loss of or damage to" Glynn's properties, neither of which was present here. D. 16 at 16–17. Glynn responds that it suffered "direct physical loss of or damage to" its properties due to (1) contamination at the insured properties by the COVID-19 virus and (2) loss of use caused both by the government emergency orders limiting on-premises consumption of food and drink and by the imminent risk of contamination by the COVID-19 virus. D. 26 at 5.

The meaning of the phrase "direct physical loss of or damage to" requires tangible damage or alteration to the insured property. See Verveine Corp. v. Strathmore Ins. Co., No. SUCV20201378BLS2, 2020 WL 8766370, at *3 (Mass. Super. Ct. Dec. 21, 2020) (concluding that the phrase "cannot . . . be construed to cover physical loss in the absence of some physical damage to the insured's property"); see also *Physical*, Black's Law Dictionary (11th ed. 2019) (defining "physical" as "involving the material universe and its phenomena" and "pertaining to real, tangible objects"); *Loss*, Black's Law Dictionary (11th ed. 2019) (defining "loss" as the "failure to maintain possession of a thing").[3] In Verveine, the court dismissed a similar claim

---

[3] Glynn suggests that this Court should refer only to standard dictionaries, as opposed to legal dictionaries such as Black's Law Dictionary, in interpreting the Policy's plain and ordinary meaning. Massachusetts courts, however, regularly reference Black's Law Dictionary in interpreting insurance policy language. See, e.g., Oliveira v. Com. Ins. Co., 94 Mass. App. Ct.

brought by Boston-area restaurant owners against an insurance company alleging improper denial of coverage for COVID-19-related business losses and expenses under a policy containing the same language as that at issue here. Verveine, 2020 WL 8766370, at *2–3. In reaching its conclusion, the court cited two Massachusetts appeals court cases indicating that a physical loss requires tangible damage to property. See id. at *3 (citing Pirie v. Federal Ins. Co., 45 Mass. App. Ct. 907, 908 (1998); HRG Dev. Corp. v. Graphic Arts Mut. Ins. Co., 26 Mass. App. Ct. 374, 377 (1988)). In HRG, the appeals court determined that the plaintiff's "all risks" policy covering only "physical loss or damage" did not cover an alleged title defect because "the salient phrase ('physical loss or damage')" could not "fairly . . . be construed to mean physical loss in the absence of physical damage." HRG, 26 Mass. App. Ct. at 377 (emphasis omitted). In Pirie, the appeals court, citing HRG, rejected the plaintiff's claim that financial losses resulting from an order of the Massachusetts Department of Public Health to remove lead from the plaintiff's building could constitute a "physical loss." Pirie, 45 Mass. App. Ct. at 908.

Taken together, these cases indicate that "physical loss" or "damage" under Massachusetts law requires that the cause of loss or damage be a tangible alteration to the property itself. See also Harvard St. Neighborhood Health Ctr., Inc. v. Hartford Fire Ins. Co., No. CV 14-13649-JCB, 2015 WL 13234578, at *8 (D. Mass. Sept. 22, 2015) (stating that "[i]ntangible losses do not fit within th[e] definition" of "direct physical loss"); Crestview Country Club, Inc. v. St. Paul Guardian Ins. Co., 321 F. Supp. 2d 260, 264–65 (D. Mass. 2004) (collecting cases narrowly interpreting "direct physical loss"); Roche Bros. Supermarkets, LLC v. Cont'l Cas. Co., No. SUCV20170159BLS1, 2018 WL 3404061, at *4 (Mass. Super. Ct. Mar. 16, 2018) (stating that the

---

276, 279 (2018); Suffolk Const. Co. v. Illinois Union Ins. Co., 80 Mass. App. Ct. 90, 94–95 (2011); Siebe, Inc. v. Louis M. Gerson Co., 74 Mass. App. Ct. 544, 551 (2009).

same policy language as here is "unambiguous" in its limited coverage of "physical loss of property and physical damage to property"). These decisions also align with a leading insurance treatise, which states that "physical loss" has been "widely held" in the insurance context "to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property." 10A Couch on Ins. § 148:46 (3d ed. 2020). Several other sessions of this Court have reached the same conclusion applying Massachusetts law to identical insurance policy language.[4] Further, at least three circuit courts have held that identical or substantially similar policy language precludes coverage of COVID-19-related business losses and expenses, albeit while applying the laws of different states.[5]

The Policy's "period of restoration" definition also supports this interpretation. Under the Policy, any losses of business income or extra expenses are covered only during the "period of restoration," which begins at an established time after the time of "direct physical loss or damage"

---

[4] See Pakachoag Acres Day Care Ctr., Inc. v. Philadelphia Indem. Ins. Co., No. CV 20-40083-TSH, 2021 WL 4392088, at *4 (D. Mass. Sept. 24, 2021); Hampshire House Corp. v. Fireman's Fund Ins. Co., No. CV 20-11409-FDS, 2021 WL 3812535, at *8 (D. Mass. Aug. 26, 2021); Picot v. MAPFRE Insurance Co., No. 20-cv-11261-MGM (D. Mass. July 26, 2021); Select Hosp., LLC v. Strathmore Ins. Co., No. CV 20-11414-NMG, 2021 WL 1293407, at *2 (D. Mass. Apr. 7, 2021); Am. Food Sys., Inc. v. Fireman's Fund Ins. Co., No. CV 20-11497-RGS, 2021 WL 1131640, at *3 (D. Mass. Mar. 24, 2021); Kamakura, LLC v. Greater New York Mut. Ins. Co., No. CV 20-11350-FDS, 2021 WL 1171630, at *5 (D. Mass. Mar. 9, 2021); Legal Sea Foods, LLC v. Strathmore Ins. Co., No. CV 20-10850-NMG, 2021 WL 858378, at *3 (D. Mass. Mar. 5, 2021); SAS Int'l, Ltd. v. Gen. Star Indem. Co., No. CV 20-11864-RGS, 2021 WL 664043, at *2–3 (D. Mass. Feb. 19, 2021).

[5] See Santo's Italian Cafe LLC v. Acuity Ins. Co., No. 21-3068, 2021 WL 4304607, at *1 (6th Cir. Sept. 22, 2021) (applying Ohio law); Gilreath Fam. & Cosm. Dentistry, Inc. v. Cincinnati Ins. Co., No. 21-11046, 2021 WL 3870697, at *1 (11th Cir. Aug. 31, 2021) (per curiam) (applying Georgia law); Oral Surgeons, P.C. v. Cincinnati Ins. Co., 2 F.4th 1141, 1143 (8th Cir. 2021) (applying Iowa law).

and ends when the property "should be repaired, rebuilt or replaced" or the business "is resumed at a new permanent location." D. 1-1 at 72, 80; see D. 1-1 ¶¶ 102, 105. The terms "repaired, rebuilt or replaced" suggest tangible damage to property, so courts have cited them as justification for denying coverage for COVID-19 business interruption losses and extra expenses. See, e.g., Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am., 487 F. Supp. 3d 834, 840 (N.D. Cal. 2020) (stating that these words "all strongly suggest that the damage contemplated by the Policy is physical in nature" (citation omitted)).

Glynn argues that interpreting the phrase "physical loss of or damage to" as requiring tangible damage or alteration to property conflates "loss" and "damage," rendering the former superfluous. See D. 26 at 7. But this is incorrect. The plain meaning of "'loss' would extend to the complete destruction of property, whereas 'damage' contemplates a lesser injury." Michael Cetta, Inc. v. Admiral Indem. Co., 506 F. Supp. 3d 168, 180 (S.D.N.Y. 2020) (emphasis omitted). Thus, both terms may demand tangible damage or alteration to property without rendering the term "loss" superfluous.

Additionally, to the extent Glynn argues that "physical loss of . . . property" should be read as general loss of use, see D. 26 at 13, the Policy contains an exclusion for such loss stating that the insurer "will not pay for loss or damage caused by or resulting from . . . [d]elay, loss of use or loss of market." D. 1-1 at 93. To follow Glynn's interpretation would fail to give meaning to all the Policy's terms and render the "loss of use" exclusion superfluous. See Verveine, 2020 WL 8766370, at *4 (noting that "[i]t would be unreasonable for any insured to read a policy containing [a loss of use] exclusion as nonetheless providing coverage for loss of use based on a separate provision clearly related to losses that are physical in nature").

Glynn also argues that the COVID-19 virus is analogous to a "permeating or pervasive" odor, which some courts have found "reasonably susceptible to an interpretation [of causing] physical injury to property." See Essex Ins. Co. v. BloomSouth Flooring Corp., 562 F.3d 399, 406 (1st Cir. 2009); Matzner v. Seaco Ins. Co., No. CIV. A. 96-0498-B, 1998 WL 566658, at *3–4 (Mass. Super. Ct. Aug. 12, 1998) (holding that "carbon-monoxide contamination constitutes 'direct physical loss of or damage to' property"); Arbeiter v. Cambridge Mut. Fire Ins. Co., No. 9400837, 1996 WL 1250616, at *2 (Mass. Super. Ct. Mar. 15, 1996) (concluding that that the "existence of [oil] fumes may be a physical loss"); see also D. 26 at 10–11. The decisions Glynn cites, however, do not alter the Court's conclusion, as courts have distinguished these and similar cases in finding lack of coverage. See, e.g., Select Hosp., 2021 WL 1293407, at *3; Am. Food Sys., 2021 WL 1131640, at *4; see also Northwell Health, Inc. v. Lexington Ins. Co., No. 21-CV-1104, 2021 WL 3139991, at *6 (S.D.N.Y. July 26, 2021) (noting that "the coronavirus—unlike invisible fumes and chemicals—does not . . . irreversibly alter the physical condition of a property").

Relatedly, Glynn points to Verveine's response to the plaintiffs' argument analogizing to Matzner and Arbeiter that "[t]he problem with this argument is that the Complaint . . . does not allege that the COVID-19 virus was actually present in plaintiffs' restaurants, resulting in physical contamination of the premises." See Verveine, 2020 WL 8766370, at *4. According to Glynn, this statement necessarily implies that such an allegation would be sufficient to show property loss. D. 26 at 12. Even assuming Matzner and Arbeiter's relevance here, however, Verveine appeared to reject the plaintiffs' argument on the basis that it lacked foundation in the complaint and so need not be considered, not that its inclusion would have rendered the plaintiffs' position correct. Cf. Legal Sea Foods, 2021 WL 858378, at *3 (stating that "even if [the plaintiff] had properly alleged

11

that COVID-19 caused business interruption losses due to its presence at the [insured properties], it would not be entitled to coverage under the [p]olicy").

Referencing the "period of restoration" definition, Glynn further contends that it engaged in activities constituting "repair" of its properties as such activities restored the properties to a "healthy" state. See D. 26 at 22 (citing dictionary entry defining "repair" as "to restore to a sound or healthy state"); D. 1-1 ¶ 66 (alleging that Glynn increased its cleaning and decontamination efforts, created outdoor eating spaces, added plexiglass barriers and reconfigured the interiors of its businesses because of the pandemic). According to Glynn, these alleged repairs support a reading that the Policy covers Glynn's losses due to COVID-19. See D. 26 at 22. But even Glynn's suggested definition of "repair" does not justify this conclusion, as it is the property itself that would need to be restored to a sound state. See D. 1-1 at 80 (noting that the period of restoration may end "when the property at the described premises should be repaired, rebuilt or replaced"). Glynn does not allege that its preemptive actions were taken to repair, rebuild or replace any property physically lost or damaged. Although Glynn's actions may have been aimed at promoting a "healthy" environment for people at its properties, Glynn did not "repair" any aspect of the properties as no repairs were in fact required. Thus, the Court cannot accept Glynn's view that such actions support a finding that it "suffered covered losses" during any period of restoration. See D. 26 at 23.

Moreover, Glynn argues that it is entitled to compensation under its "sue and labor" obligations, which provide for reimbursement of expenses incurred to mitigate damages. D. 26 at 14–15. "The sue and labor clause," however, "only provides coverage to the insured for the costs the insured expends in preventing or ameliorating losses which the insurer would be required to pay pursuant to the terms of the [Policy]." See Am. Home Assur. Co. v. Fore River Dock &

12

Dredge, Inc., 321 F. Supp. 2d 209, 220 (D. Mass. 2004); D. 1-1 at 76 (stating that RSUI will consider in the settlement of a claim for business income or extra expenses Glynn's taking "all reasonable steps to protect the Covered Property from further damage" but that RSUI "will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss"). The damages alleged are not covered by the Policy so Glynn cannot recover expenses in mitigating them for the insurance company's benefit.

Because the phrase "direct physical loss of or damage to property" requires tangible damage to property, Glynn cannot establish coverage under the Policy's business income or extra expense provisions. While the complaint alleges the actual presence of the COVID-19 virus at Glynn's locations at all relevant times, D. 1-1 ¶ 36, Glynn does not allege facts showing that such presence caused tangible damage to any of its insured properties. Similarly, neither the government's emergency orders nor the imminent risk of contamination by the COVID-19 virus caused tangible damage to any of Glynn's properties. See Verveine, 2020 WL 8766370, at *4 (rejecting "plaintiffs' argument that the COVID-19 virus constitutes an 'imminent threat' to their premises and thus could amount to a physical loss within the meaning of the policies"); see also Pirie, 45 Mass. App. Ct. at 908. Accordingly, RSUI properly denied coverage under the Policy's business income and extra expense provisions.

    2.    *Civil Authority Coverage*

Glynn alleges in the alternative that it was covered under the Policy's civil authority provision. D. 1-1 ¶ 108; D. 26 at 23. That provision requires RSUI to pay for Glynn's business interruption losses resulting from an action of civil authority only if that action "prohibits access" to an insured property. D. 1-1 ¶ 107; id. at 73. Moreover, that provision only applies "[w]hen a

Covered Cause of Loss causes damage to property other than property at the [insured] premises" when the insured premises is not more than one mile from the damaged property. Id. at 73.

Glynn contends that other properties within one mile of Glynn's insured properties also suffered from loss of use caused by the "ubiquitous" presence of the COVID-19 virus in greater Boston and by the government's emergency orders. D. 26 at 23–24. Moreover, Glynn asserts that the emergency orders, which applied to all businesses in the greater Boston area, restricted physical access to those same properties. Id.

Glynn's argument fails for several reasons. First, as established above, the mere presence of the COVID-19 virus does not qualify as "damage" under the Policy so the civil authority provision could not have been triggered in the first instance. Second, even if the presence of the COVID-19 virus did constitute property damage, the complaint fails to identify any specific "damaged property." Glynn's allegation that the COVID-19 virus was "ubiquitous" in the greater Boston area does not satisfy this requirement. See D. 26 at 24; Kamakura, 2021 WL 1171630, at *10 (stating that "complaint includ[ing] only general allegations concerning the presence of the virus in Massachusetts and the City of Boston . . . [w]ithout identifying the damaged property" failed to satisfy this requirement).

Third, even if Glynn sufficiently identified a damaged property within one mile of its own insured properties, the emergency orders at issue did not prohibit access to any of the insured properties. Governor Baker and Mayor Walsh's emergency orders permitted and even encouraged restaurants, bars and other similar establishments to continue offering food and beverages for takeout and delivery. See id. at *12 (concluding that plaintiff "fail[ed] to state a claim for Civil Authority coverage because [Governor Baker's] orders did not prohibit access to plaintiffs' properties"); Legal Sea Foods, 2021 WL 858378, at *5 (stating that "[a]lthough [plaintiff] alleges

14

that the [o]rders mandated the closure of and prohibited access to some of its insured restaurants, plaintiff fails to identify any specific [o]rder that expressly and completely prohibited access to any of the" insured properties); Verveine, 2020 WL 8766370, at *5 (noting that "plaintiffs, their employees, and their customers have not been prohibited from accessing the insureds' restaurants" but rather "[p]laintiffs still had access to the premises to prepare food and for takeout and delivery").

According to Glynn, the civil authority provision's requirement that access be "prohibited" to the properties in question does not demand a "total" prohibition for coverage. D. 26 at 24. To support this assertion, Glynn cites dictionary definitions for "prohibit," meaning "to forbid by authority" or "to prevent from doing something," and "access," meaning "permission, liberty, or ability to enter, approach, or pass to and from a place or to approach or communicate with a person or thing" or "freedom or ability to obtain or make use of something." See D. 26 at 24 (quoting *Prohibit*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/prohibit (last visited Nov. 12, 2021); *Access*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/access (last visited Nov. 12, 2021)). Applying these definitions, Glynn argues that the emergency orders prevented it from its "ordinary" freedom to make use of its insured properties as it "normally" would. D. 26 at 24–25.

Even accepting Glynn's suggested dictionary definitions, however, the emergency orders did not constitute a prohibition on access under the civil authority provision. Glynn's attempt to read into the Policy words such as "ordinary" and "normally" does not change the plain language, which states without qualification that access must be "prohibited" (i.e., that the "ability to enter" the properties in question must be "forbid[den] by authority"). Based on the facts alleged, Glynn

at all times had access to its properties. Accordingly, RSUI properly denied coverage under the Policy's civil authority provision.

### 3. Pathogen Exclusion

RSUI argues that, even to the extent Glynn states a claim for coverage, the Policy's Pathogen Exclusion applies. The Pathogen Exclusion provides that there is no coverage "for loss or damage caused directly or indirectly by the discharge, dispersal, seepage, migration, release, escape or application of any pathogenic or poisonous biological or chemical materials." D. 1-1 at 50. Further, coverage is precluded even if any other cause or event, including a Covered Cause of Loss, "contributes concurrently or in any sequence to the loss." Id.

The exclusion's plain language applies to loss or damage caused by COVID-19. "Pathogenic" means "causing or capable of causing disease." *Pathogenic*, Merriam-Webster, https://www.merriam-webster.com/dictionary/pathogenic (last visited Nov. 12, 2021). Relatedly, "pathogen" is defined as "specific causative agent (such as a bacterium or virus) of disease." *Pathogen*, Merriam Webster, https://www.merriam-webster.com/dictionary/pathogen (last visited Nov. 12, 2021). These definitions plainly apply to the COVID-19 virus. Glynn itself refers to the COVID-19 "virus" as "the coronavirus responsible for the pandemic, and associated collections of diseases," see D. 1-1 ¶ 11, and calls it a "pathogen existing and occurring in nature" in its opposition, D. 26 at 7–8. Further, the COVID-19 virus allegedly travels by "discharge," "dispersal" or "release" as it spreads through respiratory droplets, fomites or aerosols when an infected individual speaks, shouts or sings. See D. 1-1 ¶¶ 11, 22. Thus, the Pathogen Exclusion precludes coverage for COVID-19 related losses under the Policy. Accord Till Metro Ent. v. Covington Specialty Ins. Co., No. 20-CV-255-GKF-JFJ, 2021 WL 2649479, at *10 (N.D. Okla. June 28, 2021) (concluding that pathogenic exclusion with identical language applied to

COVID-19 claim); Savage City Strength, LLC v. Covington Specialty Ins. Co., No. SOM-L-831-20 (N.J. Super. Ct. Apr. 8, 2021) (same).

Glynn argues that the exclusion does not apply because the terms "discharge," "dispersal," "release" and "escape" are terms of art in environmental law and generally refer to damage or injury resulting from environmental pollution. See D. 26 at 25 (citing Nautilus Ins. Co. v. Jabar, 188 F.3d 27, 30 (1st Cir. 1999)). In Nautilus, however, the First Circuit considered a general "pollution" exclusion clause so it was natural for the court to interpret the provision in an environmental law context. See Nautilus, 188 F.3d at 29–30 (stating that it would be "entirely reasonable that an ordinarily intelligent insured would understand this provision to exclude coverage only for injuries caused by traditional environmental pollution" given this context). By contrast, the Pathogen Exclusion plainly applies to the discharge, dispersal or release of "pathogenic" material—as opposed to pollutants generally—which is the circumstance here. The Court cannot ignore the Policy's plain language. See High Voltage Eng'g, 981 F.2d at 600.

For the foregoing reasons, Glynn is not entitled to coverage under the Policy's business income, extra expense or civil authority provisions and the Pathogen Exclusion further precludes coverage for COVID-19-related losses. Accordingly, Glynn's breach of contract claim against RSUI is dismissed.

### B. Breach of Covenant of Good Faith and Fair Dealing (Count II) and Violations of Chapter 93A (Count III)

Because RSUI properly denied coverage, Glynn's claims for breach of covenant of good faith and fair dealing and for violations of Chapter 93A must fail. "The implied covenant provides 'that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract . . . .'" Weiler v. PortfolioScope, Inc., 469 Mass. 75, 82 (2014) (quoting Druker v. Roland Wm. Jutras Assocs., Inc., 370 Mass. 383, 385

17

(1976)).  "The covenant may not, however, be invoked to create rights and duties not otherwise provided for in the existing contractual relationship."  See Uno Rests., Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2004).  Further, "[w]hen coverage has been correctly denied, as in this case, no violation of the Massachusetts statutes proscribing unfair or deceptive trade practices may be found."  Styller v. National Fire & Marine Ins. Co., 95 Mass. App. Ct. 538, 546 (2019) (quoting Transamerica Ins. Co. v. KMS Patriots, 52 Mass. App. Ct. 189, 197 (2001)); see Harvard St. Neighborhood Health Ctr., 2015 WL 13234578, at *10.  As concluded above, RSUI properly denied coverage to Glynn under the Policy.  Accordingly, Glynn's claims for breach of covenant of good faith and fair dealing and for violations of Chapter 93A are dismissed.

**VI.  Conclusion**

For the foregoing reasons, the Court ALLOWS RSUI's motion to dismiss, D. 15.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge